## Lehigh Construction Co. v. Womble.

(Decided Nov. 3, 1933.)

JOSEPH LAWTON and BURKE & LAWTON for appellant.

ORIE S. WARE, ELMER P. WARE and WILLIAMO. WARE for appellee.

OPINION OF THE COURT BY HOBSON, COMMISSIONER—Affirming.

W. P. Womble, while working for the Lehigh Construction Company as a carpenter on August 8, 1928, fell from a scaffold twenty feet high and was seriously injured. The company paid him for temporary disability the sum of $15 a week, beginning one week after the injury and continuing for a period of 140 weeks, making a total of $2,220. It discontinued payments in June, 1931, and Womble then filed his claim before the Workmen's Compensation Board for permanent injury. Proof was taken, and on final hearing the board entered judgment in favor of Womble for $15 a week for

a period of 400 weeks, amounting to the sum of $6,000, less the sum of $2,220 which had been paid. The company took the case to the circuit court, which affirmed the judgment of the board, and from this judgment the company appeals.

By section 4897, Kentucky Statutes, it is provided that, when the injury to the employee causes total disability for work, the employer "shall pay the employee so injured a weekly compensation equal to sixty-five per cent. (65%) of his average weekly earnings, not to exceed fifteen dollars ($15.00) nor less than five dollars ($5.00) per week." Such payments to be made during the period of total disability, but not longer than eight years after the date of the injury, nor in any case to exceed a maximum sum of $6,000. Section 4899, Kentucky Statutes, provides for payment for partial disability, and among other things provides that the employer shall pay the employee "for the loss of an arm, sixty-five per cent. (65%) of the average weekly wages during two hundred weeks." The question presented here is, Which of these two provisions shall be applied in this case?

Womble, at the time he was injured, was fifty-two years old. He had worked at the carpenter's trade for thirty-two years, and was earning $61.20 a week. He was rendered unconscious by the fall from the scaffold, and was taken to the hospital, where the physician who first attended him simply gave temporary remedies. Dr. Elmer A. Klein, who took charge of the case on August 11, says that then his left hand and forearm were markedly swelled and discolored, the forearm was deformed, with several open wounds on the arm, through which some of the fractured bones of the forearm had protruded; those wounds were infected. He also had pain in the left side of the pelvis; he was unable to move his back or either of his lower extremities without pain. The hospital record shows that he passed blood in his urine. Two X-rays were taken. One revealed a fracture of the pelvic bone on the left side with no displacement of the fragments. The other revealed a comminuted fracture of the lower end of the left arm at the wrist. He had numerous superficial abrasions in various parts of his body extremities. To get rid of the infection, he used various dressings and solutions. A number of pieces of dead bone separated from

the patients arm, and bone had to be removed a number of times. Pockett of pus formed in the bone and had to be drained. On September 1 an anesthetic was administered under his supervision. He took off the old dressings, cleansing the extremities, applied plaster cast from the base of the fingers to the top of the arm, the whole forearm being in neutral position, the wrist in a cock-up position holding elbow at right angles. The arm slowly improved after some weeks. On November 6, 1928, he put on a second plaster cast. On December 11, 1929, he removed a loose piece of dead bone lying along the lower end of the bigger bone of the forearm at the wrist, and treated an abcessed cavity, putting in some drainage tubes for irrigating the wound. Every once in a while the amount of discharge would be markedly increased, and after a varying length of time would subside a little. On December 20, 1930, another small piece of bone was removed from his arm, and a hole that was found in the bone was filled up with live bone pieces such as they could get to bridge across the dead places in the tissue. At the end of his treatment the long axis of his hand was out of alignment, and there are scars from the previous operations and from infected sinuses. The left arm is smaller in diameter than the right. The joint has about 30 per cent. active flexion and extension of the wrist. Rotational movements of the forearm are interfered with. So are movements of the finger joints. The range of the movement which the patient has in the wrist joint is limited. He cannot move it nor can any one else, showing that it is of mechanical origin. There is a limitation of about 40 per cent. in the abductional movement of the left shoulder. There is a limitation of both internal and external rotation. There is some crepitation of the shoulder joints on both active and passive movements and some sensitiveness to pressure over the joint region, causing a diminution of functional value of the shoulder. To use the doctor's own words, he says this:

"In a fall to protect the face and body the hand and arm are extended, and in the case of Mr. Womble his left hand takes the force on the heel of his hand. The force is great enough to break the bone. Before the bone is broken it continues up the arm, and the forearm and advances

to the bones of the shoulder direct, to such an extent that the cartilage lining of the second bone making up the shoulder joint is damaged and some of it killed. Cartilage does not grow back once it is damaged or killed by injury. It is replaced by scar tissue. Scar tissue of course limits somewhat the usefulness of the joint involved.

"Q. I will ask you to state what in your opinion was the extent of percentage of his disability for work at his trade or occupation as carpenter or carpenter mechanic? A. 100%.

"Q. I will ask you to state what in your opinion is the extent of his disability for work in any other mechanical trade? A. 100%.

"Q. I will ask you to state what in your opinion is the extent of his disability for work in any labor work? A. That is out of the question, can't do any.

"Q. Can you describe on paper and in this record by some similarity what is the present condition of that arm so far as its use is concerned? A. Practically no functional use.

"Q. Is there any hope in your opinion of this arm ever becoming better for functional use or any use it may be put? A. No."

Dr. Klein's testimony is sustained by two other physicians who treated Womble and gave like testimony. On the other hand, the defendant introduced three physicians who testified that Womble had simply lost the use of his arm for the present, that with practice he may recover a part of this, and that in other respects there is no injury for which compensation should be made. Womble testified that he was not able to do any work.

The Workmen's Compensation Board, after stating the testimony, as above set out, concluded its finding in these words:

"The sum and substance of the foregoing testimony for the plaintiff is that he is in no condition now, nor will he ever be in any condition to perform any hard manual labor which would require the use of his left arm and that he will never be able to go out into the labor market and resume his

trade or obtain or keep any job requiring the use of his left arm, or one requiring him to do manual labor. They admit, of course, that he might occasionally strike a light job not requiring the use of his left arm. Defendant has not taken plaintiff back to work and plaintiff has, so far, been unable to obtain employment.''

In Simpson v. New Jersey Stone, etc., Co., 93 N. J. Law, 250, 107 A. 36, 37, the court on like facts upholding a like award said:

''The original injury was a very bad fracture of the arm, which was compound, and became infected and discharged pus for a long period. Amputation was seriously considered, but the arm was saved. There was, however, a poor recovery, and the patient had several abscesses, and at the time of the hearing was suffering, as the court found, with a severe neuritis caused perhaps by minor nerves being involved with the callous of the fracture, which, in the opinion of his physician, made him totally unfit for work, and there was evidence to support the finding that this condition would continue indefinitely unless the arm were amputated. Prosecutor's claim is that the award cannot exceed that authorized for the loss of an arm, but to this we do not agree. Cases are readily conceivable in which total and permanent disability exists without the loss of or injury to any specific member. If the physical conditions in the present case as the court found them to exist at the time of the hearing created a total disability which was permanent unless the arm were amputated (and we think the evidence justified a finding of such a condition), the case of Feldman v. Braunstein, 87 N. J. Law, 20, 93 A. 679, controls. Petitioner is not required to undergo a serious operation such as amputation of the arm at the shoulder.''

In Jellico Coal Mining Co. v. Chatfield, 200 Ky. 846, 255 S. W. 842, 844, the court, sustaining an award, said:

''Accepting the findings in this regard as final we cannot say the board was in error in holding such facts to constitute total disability. It must be borne in mind that his physical condition is such as to prove a serious handicap in procuring other

suitable employment, and, as suggested, he is too far advanced in life now to obtain an education or to undergo training for a new occupation. Appellant has deprived him of the ability to earn a livelihood in his only occupation, and it does not lie in its mouth to demand that he should assume all the responsibility of procuring new employment, regardless of the success or failure of that quest."

To same effect see Consolidation Coal Co. v. Crislip 217 Ky. 371, 289 S. W. 270, and Wells Elkhorn Coal Co. v. Vanhoose, 220 Ky. 381, 295 S. W. 464.

"If there is any evidence to support the result reached by the board, it is binding upon the courts. Broadway & Fourth Avenue Realty Co. v. Metcalfe, 230 Ky. 800, 20 S. W. (2d) 988; Big Elkhorn Coal Co. v. Burke, 206 Ky. 489, 267 S. W. 142."

Broughton's Administrator v. Congleton Lumber Co., 235 Ky. 535, 31 S. W. (2d) 903.

The court is unable to hold that there is no evidence to support the finding of the board. To set aside its finding, it is not sufficient that the evidence is conflicting or that the weight of the evidence is against the finding. It is only necessary that there be evidence of relevant consequence sustaining it. There is such evidence that the appellee has lost more than the left arm. He has sustained also an injury to the shoulder, and this is permanent, for the tissue is destroyed. The injury to the shoulder is an injury to the body or trunk of a man, and is outside of an injury to an arm. The facts proved here show that appellee is in a much worse condition than he would be if he had simply lost his arm. Other parts of the body besides the shoulder are injured. He is permanently disabled to do manual labor. His injury affects his general health and strength.

Judgment affirmed.